1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  ISRAEL MORALES,                     No. C-07-6002 TEH (PR)

12            Petitioner,               ORDER DENYING PETITION FOR WRIT
                                        OF HABEAS CORPUS
13        v.

14  D. K. SISTO, Warden,

15            Respondent.

16  _____/

17

18        Petitioner Israel Morales has filed a <u>pro se</u> writ of

19  habeas corpus under 28 U.S.C. § 2254, challenging a criminal

20  judgment from Santa Clara County Superior Court which, for the

21  reasons that follow, the Court denies.

22                           I.

23        On September 24, 2003, Petitioner was sentenced to a term

24  of 15 years to life for second-degree murder, with concurrent terms

25  of five years for shooting at an occupied motor vehicle and two

26  years for possessing a firearm.  Answer to Petition, Ex. A at 660,

27

28

United States District Court

For the Northern District of California

663-66.[1]

On January 13, 2005, the California Court of Appeal affirmed the judgment of conviction.  Ex. H.  On March 23, 2005, the California Supreme Court denied Petitioner's petition for review.  Ex. J.

Petitioner then filed a writ of habeas corpus in the Santa Clara Superior Court which was denied on April 11, 2006.  Ex. K at 7, 39-40.  Petitioner's subsequent habeas petition filed in the state appellate court was denied on September 28, 2006.  Ex. K at 7, 41.  On January 2, 2007, Petitioner filed for a writ of habeas corpus in the California Supreme Court, Ex. K, which was denied on June 13, 2007, Ex. L.

On November 28, 2007, Petitioner filed the present Petition.  Doc. #1 (hereafter "Petition").  The Court found that Petitioner stated cognizable claims for relief and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Doc. #22.  Respondent filed an answer, Doc. #26, and Petitioner has filed a traverse, Doc. #30.

II.

The California Court of Appeal provided the following factual and procedural background of the case:

> On the night of November 17, 1996, Juan Resendiz became a casualty in the war between Sureño and Norteño gangs.  One hour before his death, Resendiz and others surrounded a car occupied by [Petitioner] Israel Morales and two companions, which had been driven into an alley claimed by Sureño gang members.  The car's occupants were

---

[1]The Answer is lodged at Doc. ##26-27.  All referenced exhibits are those lodged by Respondent in support of the Answer unless otherwise noted.

2

assaulted because they appeared to be Norteños.  The
three escaped, but returned to the alley later to settle
the situation.  This time, one of [Petitioner's]
companions had a powerful handgun.  When their car was
surrounded again, the companion fired several shots,
killing Resendiz.

. . .

### Trial evidence

During the evening of Sunday, November 17, 1996, six
to ten teenage Hispanic males congregated in an alleyway
between Dubert Lane and Tami Lee Drive in San Jose, where
they drank beer and smoked marijuana.  The neighborhood
was marked with Sureño gang graffiti.  According to gang
expert San Jose Police Officer Jose Iglesias, in San Jose
the Norteños outnumber the Sureños, but this alleyway was
a known Sureño neighborhood.

Among those in the alley was Jorge Vizcarra
Hernandez, nicknamed "Oldies."[2]  Then age 19, Oldies
belonged to the Sureño gang of Vario Tami Lee Gangsters.
Marvin "Porky" Guervara, another member of this gang, was
also in the alley.  He was 14 years old at the time.
Jose Del Rosario Lopez, nicknamed "Pepe," was also in the
alley.  At the time he belonged to Vario Sureño Town.

Oldies testified that he disliked Norteños because
they considered themselves superior to Mexican immigrants
like him.  Norteños humiliated him and other Sureños and
called them "scrapas," which means trash.

According to Oldies and Porky, Norteños associate
with the color red, while Sureños associate with the
color blue.  Wearing red in a Sureño neighborhood, like
wearing blue in a Norteño neighborhood, has the effect of
waving a cape at a bull.  Rival gang members perceive it
as showing disrespect.

During the evening, Juan "Negro" Resendiz, age 19,
also known as Gustavo Barrientos, joined the other
teenagers and drank with them.  Juan lived with his
brothers and four other family members in an apartment at
1425 Dubert Lane.  Juan had two misdemeanor domestic
violence convictions for fighting with his wife.
According to Juan's brother, Edilberto, Juan once
belonged to a Sureño gang, but by 1996 he was out of the
gang and was a working family man.  Juan occasionally

---

[2]For ease of reference we will refer to people by their nicknames
and first names to avoid confusion over common surnames.

hung out with the gang members in the alley.  Edilberto was previously in Vario Colonia Trece, a Sureño gang.

That evening, a Ford Granada drove into the alley. Juan walked up to the other young men and told them that Norteños were in the car.  About five guys approached the car.  The occupants were sniffing glue.  The driver and the front seat passenger were both wearing red T-shirts. The front seat passenger had a Mongolian haircut. According to the gang expert, that haircut is a sign of a Norteño.

Oldies approached the passenger's side and asked what they were doing there.  The passenger in the back seat identified himself as Chilango, someone they knew from Tami Lee.  Oldies responded that even if he was from the area there was no reason to bring Norteños there.

The driver tried to get out of the car.  Oldies punched the front seat passenger.  Someone else punched the driver.  Someone else hit the back seat passenger. Oldies broke two of the car's windows, one with his hand and the other with a tape recorder.  The car's occupants fought back.  Edilberto told San Jose Police Sergeant Gilbert Torrez that Juan had kicked the car.  At trial Edilberto denied saying so.  Edilberto heard breaking glass and saw a fight from his apartment.  The driver backed out of the alley and drove off in a hurry, almost running someone down.[3]

Approximately one hour later, a black Camaro drove into the alley.  The driver told the young men to approach him.  It appeared he wanted to buy drugs.  At the time Oldies and some of the others were selling drugs.

A number of those present approached the car with Oldies and Juan in the lead.  When Oldies was within earshot, he recognized the driver as Chilango.  Chilango said in Spanish, "You want problems?"  According to the gang expert, that is a challenge to fight.  Oldies punched the driver.  Pepe yelled out, "he's got a gun," after the driver pulled one from his waist.[4]  They both began running.  Three or four gunshots exploded.  Oldies tripped, fell on his face, and stayed down.  The others

---

[3]Earlier that evening Oldies had fought with another man who walked into the alley wearing a red 49er's jacket and a red hat. Oldies took the jacket and hat and burned them.  There was no apparent connection between this man and [Petitioner].

[4]Pepe testified at trial that the driver was the shooter.  He admitted that he had lied before when he told the police that the passenger was doing the shooting.

also scattered and ran off.

Juan was shot as his back was turned.  One bullet penetrated his upper right arm.  He was killed by a bullet that entered the right side of his back and exited his left chest.  Juan fell to the ground.  Someone yelled out that Juan was shot.

After the first round of gunfire, the Camaro drove out of the alley, firing three more shots as it entered Crucero Drive.  One shot flattened the tire of a van that was double-parked near the alley entrance.  Another shot penetrated the wall of the van.  Inside the van were Jesus Julian Davila Avalos and his two brothers.  Porky testified that he was also shot that night-a bullet grazed his left leg.

The police recovered three cartridge casings at the entrance to the alley, a bullet in the van, and another bullet in a carport post in the alley.  According to a firearms expert, Edward Peterson, the casings and bullets were from a 10-millimeter automatic Glock model 20 handgun.  A 10-millimeter is a very powerful gun, with an unusually high caliber, a big muzzle blast, and large recoil.  It leaves a bigger wound than a smaller caliber gun.

The following day, November 18, 1996, [Petitioner] broke his date with his girlfriend at the time, Rhonda Goda (Ortez by the time of trial).  At trial she testified that she knew [Petitioner] as "Chilango" or "Alex Gonzalez."  They had two telephone conversations on November 18, 1996.  In the first one, he said that he had some things to take care of.  She was upset with him during their second conversation.  He told her the following.  The previous night he had gotten into a fight.  He went to an alley near Tami Lee with "Feo," which means "ugly," and "Torcino," which means "bacon," in Torcino's car.  Rhonda was aware this was a gang area. Feo was wearing a red sweater or shirt.  Several people surrounded the car and objected to the red sweater.  They smashed the windows of the car and started fighting. [Petitioner] was struck in the face.  They got away and went to [Petitioner's] house and talked about how "mad" they were and how they wanted to settle the situation. [Petitioner] was upset about being punched.

Torcino retrieved a gun from his house and returned to [Petitioner's] house.  Torcino wanted to "box" them. "[T]hey were going to fight them if they had to and take the gun in case they needed that."  The gun was to be their last resort.

[Petitioner] drove them back to the alley in his Camaro, which had a stick shift.  When they drove up they

5

were surrounded. One guy tried to take the keys from the ignition. They were getting punched in the car and defended themselves. As [Petitioner] drove out, Torcino, who was in the front seat, pulled out his gun and started shooting.

[Petitioner] talked to Rhonda again a week later from Tijuana. He was afraid of a long jail sentence. He did not want to "go down for something he didn't do."

[Petitioner] was arrested in New York State on December 12, 2001, living under the name of Francisco Garcia. It was stipulated that, because [Petitioner] had a prior felony conviction, he was prohibited from possessing a firearm.

People v. Morales, 2005 WL 67098, *1-*3 (Cal. Ct. App. 2005) (footnotes in original, renumbered).

### III.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, imposes a "new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." Williams v. Taylor, 529 U.S. 362, 412 (2000). Under AEDPA, a district court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

1         "Under the 'contrary to' clause, a federal habeas court
2  may grant the writ if the state court arrives at a conclusion
3  opposite to that reached by [the Supreme] Court on a question of law
4  or if the state court decides a case differently than [the Supreme]
5  Court has on a set of materially indistinguishable facts."
6  <u>Williams</u>, 529 U.S. at 412-13.  The only definitive source of clearly
7  established federal law under § 2254(d) is in the holdings (as
8  opposed to the dicta) of the Supreme Court as of the time of the
9  state court decision.  <u>Id.</u> at 412; <u>Brewer v. Hall</u>, 378 F.3d 952, 955
10  (9th Cir. 2004).  While circuit law may be "persuasive authority"
11  for the purposes of determining whether a state court decision is an
12  unreasonable application of Supreme Court precedent, only the
13  Supreme Court's holdings are binding on the state courts and only
14  those holdings need be "reasonably" applied.  <u>Clark v. Murphy</u>, 331
15  F.3d 1062, 1069 (9th Cir. 2003), <u>overruled on other grounds by</u>
16  <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003).

17         "Under the 'unreasonable application' clause, a federal
18  habeas court may grant the writ if the state court identifies the
19  correct governing legal principle from [the Supreme Court's]
20  decisions but unreasonably applies that principle to the facts of
21  the prisoner's case."  <u>Williams</u>, 529 U.S. at 413.  "Under
22  § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal
23  habeas court may not issue the writ simply because that court
24  concludes in its independent judgment that the relevant state-court
25  decision applied clearly established federal law erroneously or
26  incorrectly."  <u>Id.</u> at 411.  A federal habeas court making the
27  "unreasonable application" inquiry should ask whether the state
28  court's application of clearly established federal law was

1 "objectively unreasonable."  Id. at 409.  The federal habeas court

2 must presume correct any determination of a factual issue made by a

3 state court unless the petitioner rebuts the presumption of

4 correctness by clear and convincing evidence.  28 U.S.C.

5 § 2254(e)(1).

6 　　　　The state court decision to which § 2254(d) applies is the

7 "last reasoned decision" of the state court.  See Ylst v.

8 Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d

9 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion

10 from the highest state court considering petitioner's claims, the

11 court "looks through" to the last reasoned opinion.  In this case,

12 in evaluating Petitioner's claims of insufficiency of the evidence,

13 instructional error, and cumulative error, the Court looks to the

14 state appellate court's opinion affirming Petitioner's conviction

15 issued on January 13, 2005.  See Ylst, 501 U.S. at 805; Shackleford

16 v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  Petitioner's

17 claims regarding the inattentive juror and ineffective assistance of

18 appellate counsel were raised for the first time in his state

19 collateral proceedings, so in evaluating those claims, the Court

20 looks to the state trial court's opinion denying Petitioner's state

21 habeas petition.  See Ylst, 501 U.S. at 805.  Where the state court

22 gives no reasoned explanation of its decision on a petitioner's

23 federal claim and there is no reasoned lower court decision on the

24 claim, an independent review of the record is the only means of

25 deciding whether the state court's decision was objectively

26 reasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

27 2003).

28 　　　　The Supreme Court has vigorously and repeatedly affirmed

1  that under AEDPA there is a heightened level of deference a federal
2  habeas court must give to state court decisions.  See Hardy v.
3  Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v.
4  Richter, 131 S. Ct. 770, 783-85 (2011); Premo v. Moore, 131 S. Ct.
5  733, 739-40 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per
6  curiam).  With the above principles in mind regarding the standard
7  and limited scope of review in which this Court may engage in
8  federal habeas proceedings, the Court addresses Petitioner's claims.

9                                   IV.

10         Petitioner raises the following six grounds for habeas
11  relief:  1) insufficient evidence to support his second-degree
12  murder conviction; 2) trial court error in refusing to instruct the
13  jury regarding the effect of antecedent threats on his state of mind
14  and regarding his right to travel to a public location; 3) trial
15  court error for instructing the jury that he could be convicted of
16  murder as a natural and probable consequence of aiding and abetting
17  a misdemeanor breach of the peace; 4) cumulative error due to
18  instructional error; 5) trial court error for failing to properly
19  deal with an inattentive juror; and 6) ineffective assistance of
20  appellate counsel for failing to raise the issue of the inattentive
21  juror on appeal.

22              A.  Sufficiency of the Evidence

23         Petitioner alleges that there was insufficient evidence to
24  support his conviction for second-degree murder.  He argues that
25  there was sufficient evidence of provocation and heat of passion to
26  require a finding of voluntary manslaughter rather than second-
27  degree murder.  The state appellate court rejected his claim as
28  follows:

                                  9

After trial [Petitioner] asked the trial court to reduce his conviction to voluntary manslaughter. The trial court refused, stating that the jury's verdict of second degree murder was supported by the evidence.

On appeal [Petitioner] argues that the trial court erred because "evidence presented at trial, at most, showed that Juan Resendiz was killed in the heat of passion or by way of imperfect self-defense." "[T]he evidence was uncontroverted that Resendiz was shot as the consequence of 'a sudden quarrel or heat of passion' based on adequate provocation or imperfect self-defense."

People v. Sheran (1957) 49 Cal.2d 101 reiterated, "'upon an application to reduce the degree or class of an offense, a trial judge may review the weight of the evidence but an appellate court should consider only its sufficiency as a matter of law.'" (Id. at p. 108; original italics.)

The jury here was instructed that a killing is no more than manslaughter if committed upon a sudden quarrel or heat of passion or in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury. (CALJIC Nos. 8.40, 8.50.) "Heat of passion" was defined in terms of CALJIC No. 8.42 as including both actual passion and the passion that would be aroused in the mind of an ordinarily reasonable person. The jury was told to consider "if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return" (CALJIC No. 8.42) and "whether the cooling period has elapsed and reason has returned." (CALJIC No. 8.43.)

People v. Steele (2002) 27 Cal.4th 1230 stated: "for voluntary manslaughter, 'provocation and heat of passion must be affirmatively demonstrated.' (People v. Sedeno (1974) 10 Cal.3d 703, 719; see also People v. Breverman (1998) 19 Cal.4th 142, 163.)[¶] The heat of passion requirement for manslaughter has both an objective and a subjective component. (People v. Wickersham (1982) 32 Cal.3d 307, 326-327.) The defendant must actually, subjectively, kill under the heat of passion. (Id. at p. 327.) But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless

further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' (People v. Logan (1917) 175 Cal. 45, 49.)" (Id. at pp. 1252-1253.)

[Petitioner] contends that under "the totality of these circumstances, it is clear that Torcino fired his gun because he subjectively feared death or great bodily injury to himself and his friends at the hands of the VTG gangsters who vastly outnumbered the Camaro's occupants." We have already explained above (ante, p. 18) that there was no real evidence beyond defense counsel's speculation that [Petitioner] or Torcino subjectively entertained any fear of the alley's occupiers, let alone fear of imminent great bodily injury. Certainly this speculation does not mandate a finding of imperfect self-defense.

[Petitioner] alternatively contends that "[t]he 45 minute interval between this severe provocation and the resulting shooting was well within the 'cooling period' range for voluntary manslaughter based upon heat of passion." [Petitioner] points out that People v. Berry (1976) 18 Cal.3d 509 contemplated the possibility of the heat of passion persisting for 20 hours. (Id. at p. 516.) People v. Brooks (1986) 185 Cal.App.3d 687 contemplated passion persisting for two hours. (Id. at p. 695.) The problem identified in both of those cases was that the jury was not given the option of a voluntary manslaughter conviction. Neither upheld a finding that the heat of passion actually persisted that long.

There is no fixed formula for determining the cooling period after provocation. It is ordinarily a factual determination for a properly instructed jury whether a murder was committed in the heat of passion and under sufficient provocation. (People v. Bloyd (1987) 43 Cal.3d 333, 350; People v. Walton (1996) 42 Cal.App.4th 1004, 1019, disapproved on another ground by People v. Cromer (2001) 24 Cal.4th 889, 901, fn. 3; cf. People v. Wells. (1938) 10 Cal.2d 610, 623.) In a rare case, like People v. Bridgehouse (1956) 47 Cal.2d 406, an appellate court may find adequate provocation as a matter of law. (Id. at p. 414.)

This is not such a rare case. It was uncontradicted that [Petitioner] and his companions returned to the alley because they were "mad" about being attacked. Thus, there was evidence of the subjective component of heat of passion. However, we are not convinced as a matter of law that an hour was not enough time for this passion to have subsided and reason to have returned. In other words, the jury was justified in determining that a reasonable person would

11

not still be smarting under the provocation.  (<u>Cf.</u>
<u>People v. Wickersham</u>, <u>supra</u>, 32 Cal.3d 307, 327.)  In
this case, we conclude that the existence of provocation
and heat of passion were factual questions for the jury.
Since there was substantial evidence supporting the
second degree murder conviction, we will not say
otherwise as a matter of law.  The trial court did not
err in not reducing the conviction to voluntary
manslaughter.

<u>People v. Morales</u>, 2005 WL 67098 at *14-*16.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, <u>Jackson v. Virginia</u>, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, <u>id</u>. at 324.

However a federal court's inquiry into the sufficiency of the evidence on habeas corpus is limited.  The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Id</u>. at 319.  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  <u>Id</u>. at 324.  "The reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."  <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995).  The California standard for determining the

sufficiency of evidence to support a conviction is identical to the federal standard enunciated by the United States Supreme Court in Jackson. People v. Johnson, 26 Cal. 3d 557, 576 (1980). Sufficiency of the evidence claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324 n. 16.

> Recently, the Supreme Court has emphasized
>
> > that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury" . . . And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (quoting Cavazos v. Smith, 565 U.S. 1, 4 (2011) (per curiam)). Accordingly, on federal habeas review, relief may be afforded on a sufficiency of the evidence claim only if the state court's adjudication of such claim involved an unreasonable application of Jackson to the facts of the case. Juan H. v. Allen, 408 F.3d 1262, 1274–75 (9th Cir. 2005) (as amended).

After a careful review of the relevant law and an independent review of the record,[5] the Court cannot say that the state court's determination that there was sufficient evidence to support Petitioner's second-degree murder conviction was contrary to

---

[5]The Court must conduct an independent review of the record when a habeas petitioner challenges the sufficiency of the evidence. See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

or involved an unreasonable application of clearly established federal law or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

         As an initial matter, there is no clearly established Supreme Court precedent that requires a finding that a defendant is guilty of voluntary manslaughter (instead of second-degree murder) where there is evidence of provocation and heat of passion.  The Ninth Circuit has held that "[t]he absence of malice distinguishes manslaughter from murder . . . and the defendant's showing of a 'heat of passion' is said to negate the presence of malice."  United States v. Wagner, 834 F.2d 1474, 1487 (9th Cir. 1987) (internal citations omitted) (finding no instructional error where court instructed the jury on first and second-degree murder but did not instruct on the lesser-included offense of voluntary manslaughter because the evidence did not support a finding of voluntary manslaughter).  However, habeas relief is warranted only where the state court's conclusion is contrary to the holdings of the Supreme Court, Williams, 529 U.S. at 412-13, which is not the case here.

         Moreover, as discussed below, after an independent review of the record, this Court cannot say that no rational trier of fact could have found proof of guilt of second-degree murder beyond a reasonable doubt.  Under California law, second degree murder is the unlawful killing of a human being with malice aforethought, but without willfulness, premeditation and deliberation.  See Cal. Penal Code §§ 187 and 189.  "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no

considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.  When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought."  Cal. Penal Code § 188.  Express and implied malice "may be inferred from the circumstances of the homicide."  <u>People v. Lines</u>, 13 Cal. 3d 500, 505 (1975).

The witness testimony established that between 30 to 90 minutes elapsed between when Petitioner and his friends were initially attacked and when they returned to the alley.  Reporter's Transcript[6] ("RT") 411, 477, 676, 861.  The only testimony regarding Petitioner's state of mind was provided by Rhonda Ortez, Petitioner's girlfriend at the time of the crime.  According to Ortez, after the initial confrontation, Petitioner and his friends decided that they wanted to "settle the situation. . . [a]nd they were going to fight [their attackers] if they had to and take the gun in case they needed that."  RT 149.  The witness testimony also established that Petitioner was driving the car when he returned to the alley with his friends, and that Petitioner initiated the fight by encouraging the victim and his friends to approach the car, RT 338-39, 389-90, and then asking the victim and his friends if they wanted trouble or problems, RT 348-39, 862, which, according to the witness testimony, was an invitation to fight.  Petitioner did not testify at the trial.

The Court concurs with the California Court of Appeal's

---

[6]The Reporter's Transcript is lodged as Exhibit B to the Respondent's Answer, located at Doc. ##26-27.

reasoning and conclusion.  First, the evidence was sufficient to support the elements of second degree murder since the jury could reasonably have found implied malice in Petitioner's deciding to return to the alleyway with a gun, encouraging the victim and his friends to approach Petitioner's car, and then inviting them to fight.  Second, the evidence was sufficient to support a finding that Petitioner did not kill the victim in the heat of passion or in imperfect self-defense.  Although Petitioner and his friends were attacked by the victim and his friends earlier in the evening, it was within the province of the jury to determine whether Petitioner cooled off in the time between his initial visit to the alleyway and his return visit, especially given the limited testimony regarding Petitioner's state of mind prior to and during his return to the alley.

Based on the Court's own independent review of the record, and after viewing the evidence presented at trial in the light most favorable to the prosecution and presuming that the jury resolved all conflicting inferences from the evidence against Petitioner, the Court finds that a rational juror could have found beyond a reasonable doubt that Petitioner was guilty of second degree murder and that a rational juror could have decided that there was insufficient evidence of heat of passion or provocation. Accordingly, the Court finds and concludes that the California courts' rejection of Petitioner's insufficiency of the evidence claim did not involve an objectively unreasonable application of the Jackson standard.

//

//

**B. Instructional Error**

**1) Refusal to Give Special Defense Instructions**

Petitioner contends that the trial court erred by refusing to give the following two jury instructions:  (1) a special defense instruction to have the jury consider Petitioner's awareness of antecedent violent behavior or threats on his state of mind; and (2) a special defense instruction that an individual has a right to travel to a public location even if he has cause to believe that he may be attacked there.  Petitioner contends if the trial court had given the above special jury instructions, the jury would have found that he acted in self-defense.

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings.  See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. See id.  Moreover, due process does not require that an instruction be given unless the evidence supports it.  See Hopper v. Evans, 456 U.S. 605, 611 (1982); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).  The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory.  United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996); United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979).

Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  See Duckett, 67 F.3d at 745.  An examination of the record is required to see precisely what was given and what was

refused and whether the given instructions adequately embodied the defendant's theory. See Tsinnijinnie, 601 F.2d at 1040. The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (quoting Henderson v. Kibbe, 431 U.S. 145, 156 (1977)); see id. at 972 (due process violation found in capital case where petitioner demonstrated that application of the wrong statute at his sentencing infected the proceeding with the jury's potential confusion regarding its discretion to impose a life or death sentence).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. See Walker v. Endell, 850 F.2d 470, 475-76 (citing Henderson, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).

a) Jury Instruction Regarding Antecedent Threats

Petitioner claims that the trial court erred in refusing to give the following requested pinpoint instruction:

One who has suffered prior acts of violence or threats by another is justified in acting more quickly and taking harsher measures for his own protection in the event of either an actual or threatened assault, than would be a person who had not suffered such acts of violence or threats. If in this case you believe that (insert name of victim or any attackers relevant to self-defense) previously acted violently or threatened the defendant; and that the defendant, because of such violent acts or threats, had reasonable cause to fear greater peril in the event of an altercation with (insert name of victim or any attackers relevant to self-defense), you are to consider such facts in

determining whether the defendant acted as a
reasonable person in protecting his own life or
bodily safety.

The Court of Appeal rejected Petitioner's argument as follows:

The jury was given a number of instructions
pertaining to self-defense and imperfect self-defense
(CALJIC No. 5.17), including the following.  "The
killing of another person in self-defense is justifiable
and not unlawful when the person who does the killing
actually and reasonably believes: One, that there is
imminent danger that the other person will either kill
him or cause him great bodily injury.  [¶]  And two,
that it is necessary under the circumstances for him to
use in self-defense force or means that might cause the
death of the other person, for the purpose of avoiding
death or great bodily injury to himself.  A bare fear of
death or great bodily injury is not sufficient to
justify a homicide.  To justify the taking of the life
of another in self-defense, the circumstances must be
such as would excite the fears of a reasonable person
placed in a similar position, and the party killing must
act under the influence of those fears alone.  The
danger must be apparent, present, immediate and
instantly dealt with, or must so appear at the time to
the slayer as a reasonable person, and the killing must
be done under a well-founded belief that it is necessary
to save one's self from death or great bodily harm."
(CALJIC No. 5.12.)

"Homicide is justifiable and not unlawful when
committed by any person in the defense of himself if he
actually and reasonably believed that the individual
killed intended to commit a forcible and atrocious crime
and that there was imminent danger of that crime being
accomplished.  A person may act upon appearances whether
the danger is real or merely apparent."  (CALJIC No.
5.13.)

"It is [lawful][7] for a person who is being
assaulted to defend himself from attack if, as a
reasonable person, he has grounds for believing and does
believe that bodily injury is about to be inflicted upon
him.  In doing so, that person may use all force and
means which he believes to be reasonably necessary and
which would appear to a reasonable person, in the same
or similar circumstances, to be necessary to prevent the
injury which appears to be imminent."  (CALJIC No.
5.30.)

---

[7]The reporter's transcript reflects that the court orally stated
"unlawful" at this point, but the jury was given the correct
instruction in writing.

"A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat.  In the exercise of his right of self-defense a person may stand his ground and defend himself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and a person may pursue his assailant until he has secured himself from danger if that course likewise appears reasonably necessary.  This law applies even though the [assailed][8] person might more easily have gained safety by flight or by withdrawing from the scene."  (CALJIC No. 5.50.)

"Actual danger is not necessary to justify self-defense.  If one is confronted by the appearance of danger which arouses in his mind, as a reasonable person, an actual belief and fear that he is about to suffer bodily injury, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing himself in like danger, and if that individual so confronted acts in self-defense upon these appearances and from that fear and actual belief, the person's right of self-defense is the same whether the danger is real or merely apparent."  (CALJIC No. 5 .51.)

No instruction expressly described the relevance of prior assaults or threats by the victim and his associates to a defendant's perception of imminent danger or injury.  The trial court refused the requested instruction on the basis that the pattern instructions above sufficiently covered the circumstances of the case and [Petitioner's] theory.

A defendant can bolster his claims of self-defense and imperfect self-defense by showing that third parties had previously assaulted or threatened him and that the defendant reasonably associated that assault or threat with the victim.  (People v. Minifie (1996) 13 Cal.4th 1055, 1060, 1069.)  People v. Gonzales (1992) 8 Cal.App.4th 1658 stated, "It is well settled a defendant asserting self-defense is entitled to an instruction on the effect of antecedent threats or assaults by the victim on the reasonableness of defendant's conduct (People v. Moore (1954) 43 Cal.2d 517, 527-528 [Moore]; People v. Pena (1984) 151 Cal.App.3d 462, 475 [Pena]; People v. Bush (1978) 84 Cal.App.3d 294, 303-304 [Bush]; People v. Torres (1949) 94 Cal.App.2d 146, 151-154 [Torres]; People v. Graham (1923) 62 Cal.App. 758, 765; People v. Bradfield (1916) 30 Cal.App. 721, 727)."  (Id.

[8]The reporter's transcript reflects that the court orally stated "assailant" at this point, but the jury was given the correct instruction in writing.

at pp. 1663-1664; italics omitted; cf. People v. Spencer (1996) 51 Cal.App.4th 1208, 1220.) [Petitioner] cited this authority to the trial court and he relies on it on appeal.

The refusal to give such an instruction has led to reversal in several cases. In Moore, supra, 43 Cal.2d 517, a woman shot her husband and was convicted of manslaughter. The court pointed out the existence of evidence that he had "not only beaten and assaulted her, but had threatened her with different types of bodily injury and death and, on the evening in question, did in fact assault her." (Id. at p. 529.) The court concluded that the evidence in the case was closely balanced and there were errors in other instructions that required reversal. (Id. at p. 531.) In Torres, the defendant knew the victim as a troublemaker who had stabbed someone before in a fight and who had threatened to get or kill the defendant. (Torres, supra, 94 Cal.App.2d at p. 148.) Torres was "a close case with strongly conflicting evidence" in which the defendant was convicted of second degree murder for stabbing the victim. (Id. at p. 153.) In Bush, a wife stabbed her husband and was convicted of involuntary manslaughter. It was uncontradicted at trial that "in the course of two prior beatings, her husband had threatened to put her in her grave." (Bush, supra, 84 Cal.App.3d at p. 304.) The court observed, "the evidence in this case was very closely balanced." (Id. at p. 308.) In Pena, the defendant had observed the victim's physical violence against others, was aware that the victim carried a gun, and the victim had threatened him. (Pena, supra, 151 Cal .App.3d 462, 476-477.) The defendant was convicted of voluntary manslaughter after shooting the victim. Citing Bush and Torres, the court stated that this error was presumed to be prejudicial. (Pena, supra, at p. 475.)

The Attorney General contends that these cases are all distinguishable because each involved "substantial uncontradicted evidence of threats by the victim against the accused." It is true that there was no evidence in this case that the ultimate victim, Juan Resendiz, had ever threatened or assaulted [Petitioner] or the shooter, Torcino, personally. There was only a prior statement by Juan's brother Edilberto that Juan had kicked their car. However, as [Petitioner] points out, there was evidence that Juan associated with others who had violently assaulted [Petitioner] and his companions after Oldies told [Petitioner] he was unwelcome to bring Norteños into their neighborhood. While the prior threat language in the requested instruction may have been irrelevant, the prior assault language was relevant.

21

A more significant distinction is that in each of
these cases the defendant testified.  (<u>Moore</u>, <u>supra</u>, 43
Cal.2d at p. 521; <u>Pena</u>, <u>supra</u>, 151 Cal.App.3d at p. 470;
<u>Bush</u>, <u>supra</u>, 84 Cal.App.3d at p. 299; <u>Torres</u>, <u>supra</u>, 94
Cal.App.2d at pp. 148-149.)  In those cases, as in
<u>People v. Minifie</u>, <u>supra</u>, 13 Cal.4th at pp. 1061-1062,
the jury had evidence about the subjective component of
self-defense and imperfect self-defense, the defendant's
actual perception of imminent danger.

     <u>People v. Viramontes</u> (2001) 93 Cal.App.4th 1256
stated: "The subjective elements of self-defense and
imperfect self-defense are identical.  Under each
theory, the appellant must actually believe in the need
to defend himself against imminent peril to life or
great bodily injury.  To require instruction on either
theory, there must be evidence from which the jury could
find that appellant actually had such a belief.  This
evidence may be present even though appellant did not
testify or make a statement admitted at trial.
[Citation.]  If the trier of fact finds the requisite
belief in the need to defend against imminent peril, the
choice between self-defense and imperfect self-defense
properly turns upon the trier of fact's evaluation of
the reasonableness of appellant's belief."  (<u>Id.</u> at p.
1262.)

     Witnesses other than the defendant may provide
evidence of the defendant's actual perception of
imminent danger.  In this case [Petitioner's] version of
the events was provided by his then-girlfriend.  What he
told Rhonda was that he was upset about being punched
and "mad" at the guys who punched him.  It may have been
implicit that they were Sureño gang members because they
objected to Norteños and to the color red being in their
area.  What does not appear in her testimony is that
either [Petitioner] or Torcino actually feared them
based on their prior confrontation or their reputation.
Indeed, [Petitioner's] return to the scene would seem to
belie a fear of imminent danger.

     Defense counsel had little to work with in arguing
to the jury that [Petitioner] actually feared imminent
injury.  He argued, "consider the vulnerability of
someone who is locked in a car and surrounded by 10 to
15 gang members.  And ask yourself the question if there
is a reasonable doubt that there is a threat of great
bodily injury in that situation."  "Imagine being
attacked and surrounded by, the numbers range, as little
as probably seven, as many as maybe 15 is really the
number range.  Imagine being trapped in a car surrounded
by 7 or 15 people and you tell me that you have any
ability to fairly defend yourself or to fight.  You
don't."  "Actual danger is not necessary.  This is a
particular instruction.  You do not in a self-defense

situation have to actually face danger.  There has to be
the appearance of danger.  And you have to put it in the
context.  In particular in this situation of the context
of what had happened before.  That the fact that they
walk up to the them, [sic] the Buick, the first time,
that they punch through the window, they start beating
these guys.  That they start to drag them out of the
car.  All of that is going to at least play into their
abilities or the decision they have to make as to how
serious the threat is, how imminent the threat is, and
how they have to react to that threat."  In other words,
defense counsel asked the jurors to imagine that
[Petitioner] and Torcino were afraid, as the jurors
might have been in a similar situation after a prior
assault.

    In the absence of substantial evidence that
[Petitioner] or Torcino actually feared imminent injury,
we question whether any self-defense instructions were
required.  (<u>People v. Rodriguez</u> (1997) 53 Cal.App.4th
1250, 1270; <u>cf. People v. Romero</u> (1999) 69 Cal.App.4th
846, 856.)  While self-defense instructions were given,
we conclude that the court did not err in this case in
refusing to specially instruct the jury about the
relevance of [Petitioner's] prior confrontation with the
victim's associates, because there was no evidence that
[Petitioner] or Torcino, in the terms of the requested
instruction, actually feared "greater peril" as a result
of the prior confrontation.  In other words, there was
no evidence of this subjective component of
self-defense.

    In any event, we would conclude that [Petitioner]
was not prejudiced by the absence of this instruction.
None of the given instructions prevented the jury from
considering the prior confrontation as among "the
circumstances" (CALJIC No. 5.12), the "similar position"
(CALJIC No. 5.12), "the same situation seeing and
knowing the same facts" (CALJIC No. 5.17), "the same or
similar circumstances" (CALJIC No. 5.30), the "similar
situation" and "similar knowledge" (CALJIC No. 5.50),
the "like situation, seeing and knowing the same facts"
(CALJIC No. 5.51) relevant to evaluating the
reasonableness of [Petitioner's] response.  Indeed, the
prior confrontation was relevant according to the
prosecutor's argument.  As quoted above (<u>ante</u>, p. 10),
the prosecutor argued that [Petitioner] and his
companions knew what to expect because an hour before
they had gotten "their butts kicked."  It is not
reasonably probable that [Petitioner] would have
obtained a more favorable verdict if the requested
instruction had been given.  (<u>People v. Gonzales</u>,
<u>supra</u>, 8 Cal.App.4th 1658, 1664-1665.)

    We reject [Petitioner's] argument that the omission

1     of this instruction was federal constitutional error.
      It did not deprive [Petitioner] of a defense or prevent
2     the jury from considering all the relevant
      circumstances.  People v. Humphrey (1996) 13 Cal.4th
3     1073 concluded that it was merely state constitutional
      error when the court erroneously instructed the jury not
4     to consider battered women's syndrome evidence as
      relevant to the objective reasonableness of the
5     defendant's belief.  (Id. at p. 1089.)  The error in our
      case, if any, was not as serious at that in Humphrey, as
6     it did not preclude jury consideration of evidence of
      the prior confrontation.  (People v. Spencer, supra, 51
7     Cal.App.4th 1208, 1221.)

8     People v. Morales, 2005 WL 67098 at *8-*12.

9           Based on an examination of the record, the Court finds

10    that the failure to instruct on antecedent threats did not deprive

11    Petitioner of the fair trial guaranteed by the Fourteenth Amendment.

12    The Court finds that the record supports the state court's

13    conclusion because there was little evidence of Torcino or

14    Petitioner's subjective belief that they actually feared imminent

15    danger.  Accordingly, due process did not require giving self-

16    defense instructions.  See Hopper, 456 U.S. at 611; Menendez, 422

17    F.3d at 1029.

18          Moreover, when viewed as a whole, the jury instructions

19    given adequately embodied Petitioner's self-defense theory and

20    permitted the jury to consider the initial altercation.  As the

21    state court noted, the previous encounter could have been considered

22    by the jury as under "the circumstances" (CALJIC No. 5.12), the

23    "similar position" (CALJIC No. 5.12), "the same or similar

24    circumstances" (CALJIC No. 5.30), the "similar situation" and

25    "similar knowledge" (CALJIC No. 5.30) and the "like situation,

26    seeing and knowing the same facts" (CALJIC No. 5.51).  Given that

27    the jury was permitted to consider the previous encounter under

28    these instructions, the Court finds that the trial court's refusal

to instruct explicitly on the relevance of antecedent threats was
not so prejudicial as to infect the entire trial and so deny due
process.   See Tsinnijinnie, 601 F.2d at 1040.

                b) Jury Instruction Regarding Right To Travel

           Petitioner claims that the trial court erred in refusing
to give a special defense instruction on the right to travel.   The
state appellate court rejected Petitioner's claim as follows:

> The jury was instructed: "The right of
> self-defense is not available to a person who
> seeks a quarrel with the intent to create a real
> or apparent necessity of exercising
> self-defense."   (CALJIC No. 5.55.)   On the other
> hand, a person threatened with attack need not
> retreat.   "This law applies even though the
> assailed person might more easily have gained
> safety by flight or by withdrawing from the
> scene."   (CALJIC No. 5.50, quoted, ante, p. 14.)
>
> On appeal [Petitioner] complains that the
> court erred in refusing his request to give the
> following pinpoint instruction.   "The defendant
> has no obligation to curtail his activities to
> avoid an encounter with [a person; people] who
> may attack him.   Therefore, a defendant does not
> forfeit his right to self-defense simply by going
> to a location, even if the defendant has reason
> to believe that the other [person; people] may
> initiate an assault."
>
> [Petitioner] requested this instruction as
> an antidote to the instruction that a person may
> not seek out a quarrel.   The trial court refused
> the requested instruction because "existing
> CALJIC instruction 5.55 is sufficient to allow
> the defense to argue this theory of the case,
> although the Court has some doubt as to whether
> or not it is appropriate for [Petitioner] to have
> returned to an alleyway, which was so highly
> populated and where gang members conducted so
> many of their activities.   But I believe that
> that may be an appropriate theory of the law, but
> I do not believe it is an appropriate pinpoint
> instruction, given the more neutral CALJIC
> instruction ... 5.55."
>
> [Petitioner] premised this requested
> instruction on People v. Gonzales (1887) 71 Cal.
> 569 (Gonzales).   In that case the defendant was

"the paramour" of the mother of his shooting victim.  (<u>Id.</u> at p. 574.)  There was evidence that the victim and his companion had warned the defendant to leave town.  An officer advised the defendant "he had a right to stay where he was." (<u>Id.</u> at p. 573.)  The defendant armed himself with a pistol for self-defense and went to the mother's house, although "expecting an attack" that subsequently ensued.  (<u>Id.</u> at p. 574.)  The California Supreme Court identified several problems with the given instructions including the "nineteenth instruction," which was not detailed in the opinion.  (<u>Id.</u> at p. 577.)

The court explained: "A man who expects to be attacked is not always compelled to employ all the means in his power to avert the necessity of self-defense before he can exercise the right of self-defense.  For one may know that if he travels along a certain highway he will be attacked by another with a deadly weapon, and be compelled in self-defense to kill his assailant, and yet he has the right to travel that highway, and is not compelled to turn out of his way to avoid the expected unlawful attack.  [¶]  In this case, the defendant had a right to go to Miss Umphlet's house, if invited there by her, even if he expected there to be attacked, and the fact that he did go there did not of itself take away from him the right of self-defense, if unlawfully attacked."  (<u>Gonzales</u>, <u>supra</u>, 71 Cal. at pp. 577-578.)

Gonzales found fault with an unspecified instruction, but it did not require such an instruction as defendant requested.

<u>People v. Bolden</u> (2002) 29 Cal.4th 515 stated: "We have suggested that 'in appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged.  [Citations.]  But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]."  (<u>Id.</u> at p. 558.)

In our view, CALJIC No. 5.50 adequately informed the jury that [Petitioner] had the right to remain in a location and stand his ground when attacked, with the exception stated in CALJIC No.

5.55 that he could not go to that location with the intent to create a confrontation giving rise to an apparent need to employ self-defense. While the jury might have been able to harmonize the requested instruction with CALJIC No. 5.55, the requested instruction appears to us to have an argumentative tone, telling the jury that he had "no obligation" to curtail his travels.

This argument was properly made at length by defense counsel to the jury. "[T]he meat of what I think the District Attorney has been telling you is, these guys have no right to go back there. They have no right to go into that alley." "They have every right to be in that alley. I mean, I want you to think about this in a real common sense way, since when does a person who is attacked lose their right to go to a public place?" He gave the example of a bully chasing a child from a playground.

"I ask you when did we surrender our streets to marauding, attacking thugs who live in our alley. I mean it's ridiculous to suggest that these people don't have a right to go back there." "You don't lose the right to go back to that playground or to walk-walk to school because you are going to run into a bully who's told you he is going to beat you next time."

The prosecutor responded that a child could retaliate against a bully by punching him in the nose. "What he doesn't have a right to do is bring a gun with him" and settle it up with a handgun.

Not only was the requested instruction argumentative, we see no evidentiary support for it. Despite counsel's arguments, the only evidence of [Petitioner's] intent, even according to what [Petitioner] told his girlfriend, was that he and his friends went back to the alley with a gun intending to fight their attackers and settle the situation. Under these circumstances, [Petitioner] was not exercising his general right to travel in public places. Since they were seeking a fight, they were not "merely ... returning to the place where they" where they [sic] had a right to be. We conclude that the trial court properly refused this requested instruction.

People v. Morales, 2005 WL 67098 at *12-*14.

//

Based on an examination of the record, the Court agrees with the state appellate court's conclusion that the evidence did not support the Petitioner's requested pinpoint instruction on the right to travel.  Petitioner and his friends returned to the alley because they were angry about the initial altercation.  They were not travelling to a public location as a result of their normal activities.  Accordingly, due process did not require that the trial court instruct the jurors that Petitioner had a right to travel. See Hopper, 456 U.S. at 611; Menendez, 422 F.3d at 1029.

### 2) Erroneous Jury Instruction

Petitioner also contends that the trial court erred by instructing the jury that he could be convicted of murder as a natural and probable consequence of aiding and abetting a misdemeanor breach of the peace.  Petitioner argues that, pursuant to the misdemeanor-manslaughter section of Cal. Penal Code § 192(b), "one who intends to do no more than commit a misdemeanor breach of the peace does not possess [the] malice aforethought [required for murder]."  Petition at 111.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). See, e.g., Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not element of crime for jury determination, not open to challenge on federal habeas review); Walker, 850 F.2d at 475-76 (failure to define recklessness at most error of state law where recklessness relevant to negate duress defense and government not required to bear burden of proof of duress).  To obtain federal

collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right].'").  However, the defined category of infractions that violate the fundamental fairness inherent in due process is very narrow: "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."  Estelle, 502 U.S. at 73.

A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."  Id. (citation omitted).

The trial court instructed the jury as follows:

"One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.

"In order to find the defendant guilty of the crimes of murder, manslaughter, assault with a deadly weapon on Marvin Guevara, or shooting at an occupied motor vehicle, you must be satisfied beyond a reasonable doubt that:

"One, the crime of breach of the peace was committed.  [¶]  Two, that the defendant aided and abetted that crime.  [¶]  Three, that a coprincipal in that crime committed the crimes of murder, manslaughter, assault with a deadly weapon on Marvin Guevara, or shooting at an occupied motor vehicle.

"And, four, the crimes of murder, manslaughter, assault with a deadly weapon on Marvin Guevara, or shooting at an occupied motor vehicle were a natural and probable consequence of the commission of the crime of breach of the peace; or in order to find the defendant guilty of the crimes of murder, manslaughter, assault with a deadly weapon on Marvin Guevara, or shooting at an occupied motor vehicle you must be satisfied beyond a reasonable doubt that:

"One, the crime of assault with a firearm was committed.  [¶]  Two, that the defendant aided and abetted that crime.  [¶]  Three, that a coprincipal in that crime committed the crimes of murder, manslaughter, assault with a deadly weapon on Marvin Guevara, or shooting at an occupied motor vehicle.

"And, four, the crimes of murder, manslaughter, assault with a deadly weapon on Marvin Guevara, or shooting at an occupied motor vehicle were a natural and probable consequence of the commission of the crime of assault with a firearm.

"You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of murder or manslaughter was a natural and probable consequence of the commission of that target crime.

"Whether a consequence is natural and probable is an objective test based not on what the defendant actually intended but on what a person of reasonable and ordinary prudence would have expected would be likely to occur.  The issue is to be decided in light of all the circumstances surrounding the incident.  A natural consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.  Probable means likely to happen."  (See CALJIC No. 3.02.)

The court further instructed the jury on the definition of aiding and abetting (CALJIC No. 3.01) and on the elements of the misdemeanor of fighting or challenging another to fight in a public place in violation of section 415, subdivision (1).  (CALJIC No.

16.260.)

People v. Morales, 2005 WL 67098 at *4. CALJIC No. 3.01, as given at trial, stated: "A person aids and abets the commission or attempted commission of a crime when he or she: One, with knowledge of the unlawful person (sic) of the perpetrator and two, with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and three, by act or advice aids, promotes, encourages, or instigates the commission of the crime. Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. Mere knowledge that a crime is being committed and the failure to present it does not amount to aiding and abetting." Ex. B at 1125. CALCIC No. 16.260, as given at trial, stated: "Every person who, one, unlawfully fights in a public place is guilty of a violation of section 415(1) of the Penal Code, a misdemeanor. In order to prove this crime, each of the following elements must be proved: One, a person willfully and unlawfully fought another person, or challenged another person to fight; and two, the fight, or the challenge, occurred in a public place." Id. at 1128.

Petitioner argues that the above instructions incorrectly state the law by allowing for a misdemeanor breach of the peace to serve as a the predicate for a murder conviction under the aiding and abetting - natural probable consequences doctrine. Specifically, he argues that a person who commits a misdemeanor breach of the peace does not possess the malice aforethought required for second-degree murder. He concludes that a misdemeanor breach of the peace can only lead misdemeanor manslaughter under

31

Cal. Penal Code § 192(b).  The state appellate court rejected
Petitioner's claim on the following grounds:  that whether another
crime was an objectively foreseeable consequence is primarily a
factual question for the jury and that Petitioner's case was
governed by People v. Montes, 74 Cal. App. 4th 1050 (1999), which
holds that under certain circumstances such as gang violence the
targeted offense of breach of the peace was closely connected to the
victim's murder.  People v. Morales, 2005 WL 67098, *6-*7.  The
state appellate court also rejected Petitioner's claim that it was
cruel and unusual punishment to convict Petitioner or murder based
on aiding and abetting a breach of the peace, finding that the jury
could have found that Petitioner aided and abetted an armed assault
and that Petitioner's sentence was appropriate given the
circumstances of Petitioner's case.  Id. at *8.

         After a careful review of the record, the Court cannot say
that the aiding and abetting instruction given at Petitioner's trial
was incorrect or resulted in actual prejudice to Petitioner.  As an
initial matter, the state court's rejection of this claim was not
contrary to established Supreme Court law.  To the extent that
Petitioner argues that the state court erred as a matter of law, his
claim is not cognizable in federal court.  Secondly, the state
court's finding was not an unreasonable determination of the facts.
As the state court noted, Petitioner and his friend returned to an
alley seeking to "settle" things between themselves and rival gang
members when the initial encounter had resulted in a fight.
Petitioner drove his friends to the alley, knowing that his friend
Torino had brought a gun.  Petitioner also coaxed the victim and his
friends into the alley and closer to his car.  Finally, Petitioner

challenged the victim and his friends to a fight.  The jury's
conclusion that the murder was a foreseeable consequence of either a
breach of the peace or an armed assault was supported by the
evidence presented at trial.

        The Court also finds that the trial court's determination
that Petitioner's indeterminate life sentence was not cruel and
unusual punishment was neither contrary to clearly established
Supreme Court law nor an unreasonable determination of the facts.
Respondent correctly notes that "narrow" proportionality principle
contained in the Eighth Amendment "does not require strict
proportionality between crime and sentence," but rather forbids only
"extreme sentences that are 'grossly disproportionate' to the
crime."  <u>Graham v. Florida</u>, 130 S. Ct. 2011, 2021 (2010).
"[O]utside the context of capital punishment, successful challenges
to the proportionality of particular sentences will be exceedingly
rare."  <u>Solem v. Helm</u>, 463 U.S. 277, 289-90 (1983).  Accordingly,
the state appellate court reasonably found that the punishment of an
indeterminate life sentence is not cruel and unusual punishment for
second degree murder committed under the circumstances of this case,
and not contrary to Supreme Court precedent.

### 3) Cumulative Error

        Petitioner contends that the cumulative effect of the
above jury instruction errors resulted in the denial of his right to
a fair trial.  In some cases, although no single trial error is
sufficiently prejudicial to warrant reversal, the cumulative effect
of several errors may still prejudice a defendant to such a degree
that his conviction must be overturned.  <u>Alcala v. Woodford</u>, 334
F.3d 862, 893-95 (reversing conviction where multiple constitutional

errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).  Cumulative error is more likely to be found prejudicial when the government's case is weak. See, e.g., Thomas v. Hubbard, 273 F.3d 1164, 1180 (9th Cir. 2002), overruled on other grounds by Payton v. Woodford, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime); Walker v. Engle, 703 F.2d 959, 961-62, 968 (6th Cir.), cert. denied, 464 U.S. 951 (1983).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).  As discussed above, Petitioner has failed to establish any constitutional error in the jury instructions.  Accordingly, his claim of cumulative error does not warrant habeas relief.

### C. Juror Misconduct

Petitioner contends that the trial court erred by failing to "make whatever inquiry is necessary" to determine whether an inattentive juror should have been discharged.  Specifically, Petitioner claims that Juror No. 5's inattentiveness deprived him of a fair trial as guaranteed by the Sixth Amendment.  Petitioner points to two instances of inattentiveness.  On June 5th, 2003, the second day of witness testimony, the trial court interrupted proceedings to awaken Juror No. 5.

The Court:      {Name Redacted.} {Name redacted}, are you paying attention?
Juror No. 5:    Sorry, I dozed off with the heat.

```
The Court:      Pardon me?
Juror No. 5:    From the heat.
The Court:      It's too hot?
Juror No. 5:    I'm okay.
The Court:      Are you hearing everything?
Juror No. 5:    Yes, sir.
The Court:      We want everybody to pay attention.  If you
                can't pay attention we want to know.
Juror No. 5:    Okay.  Thank you.
```

RT 357.  The following day, on June 6, 2003, Juror Nos. 4, 7 and 12 and alternate jurors Nos. 1 and 2 sent the trial judge a note stating: "Some of the jurors have come together to agree that Juror #5 has not payed (sic) close attention to this case because of sleeping during the trial as vital evidence was being said and showed.  We don't feel that he will be as fair with a decision during deliberation.  Can you please take this into consideration.  Thank you."  Ex. K at 44.

Petitioner raised this claim for the first time in his state habeas petition filed in the state superior court.  In support of his state habeas petition, Petitioner provided a sworn declaration from his trial attorney stating that he had no independent recollection as to whether the jurors' note was brought to his attention.  His trial attorney further stated that had any issue regarding a sleeping juror been brought to his attention, he expects that he would made some record of his response.  Petition at 71-73.  Petitioner also filed a personal declaration in support of his state habeas petition wherein he stated that he did not recall the trial court admonishing a juror regarding his or her attentiveness, and that he did not notice whether any member of the jury panel was sleeping.  Id. at 74-76.

The state superior court rejected his claim as follows:

1

> In the present case, [P]etitioner has failed to
> show prejudice. Petitioner has failed to show that
> his due process or Sixth Amendment rights were
> violated by having [juror #5 remain] . . . As pointed
> out by Petitioner, the juror was awakened once by the
> judge during trial. However, defense counsel did not
> ask that the juror be dismissed. Where the juror's
> conduct did not appear to even merit any action by
> the defense, it would not merit further hearing by
> the judge. (People v. Bradford (1997) 15 Cal.4th
> 1229, 1349.)

Ex. K at 40-41.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a trial by a fair and impartial jury. Irvin v. Dowd, 366 U.S. 717, 722 (1961). The right to a jury trial is extended to state criminal trials through the Due Process Clause of the Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145, 148-149 (1968) (holding that "the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which — were they to be tried in a federal court — would come within the Sixth Amendment's guarantee."). Due process requires a jury capable and willing to deliberate solely based upon the evidence presented, and a trial judge watchful to prevent prejudicial occurrences and to assess their effects if they happen. Smith v. Phillips, 455 U.S. 209, 217 (1982).

Inattentiveness can be a form of juror misconduct and may constitute cause to discharge a juror. However inattentiveness is not, per se, a violation of a criminal defendant's right to due process, a fair trial, or an impartial jury. Tanner v. United States, 483 U.S. 107, 126-27 (1987). See also United States v. Olano, 62 F.3d 1180, 1189 (9th Cir. 1995) ("[T]he presence of all awake jurors throughout an entire trial is not an absolute prerequisite to a criminal trial's ability to reliably serve its

1   function as a vehicle for determination of guilt or innocence.  A

2   single juror's slumber is thus not <u>per se</u> plain error." (internal

3   citations omitted)); <u>United States v. Springfield</u>, 829 F.2d 860, 864

4   (9th Cir. 1987) (finding no violation of due process or the right to

5   a fair trial and impartial jury when a juror napped through part of

6   the trial testimony).  In other words, habeas corpus relief may be

7   granted only if the juror's alleged inattentiveness had "a

8   substantial and injurious effect or influence in determining the

9   jury's verdict."  <u>Brecht</u>, 507 U.S. at 637.

10         After a careful review of the record, this Court cannot

11  say that the state court's rejection of Petitioner's juror

12  misconduct claim was contrary to or involved an unreasonable

13  application of clearly established federal law or that it resulted

14  in a decision that was based on an unreasonable determination of the

15  facts in light of the evidence presented in the state court

16  proceeding.  28 U.S.C. § 2254(d).  The evidence is not conclusive as

17  to the extent of juror #5's inattentiveness.  The record indicates

18  that juror #5 dozed off once during the trial and that five of the

19  other jurors (two of them being alternate jurors) believed that

20  juror #5 was sleeping during the presentation of "vital evidence."

21  Ex. K at 44.  However, the record also indicates that defense

22  counsel did not ask for the dismissal of juror #5 or for a hearing

23  regarding juror #5 after the trial court admonished juror #5 for not

24  paying attention.⁹  And the record indicates that there was

25

26         ⁹Petitioner appears to imply that his counsel was not informed
    of the jurors' note expressing their concern regarding juror #5.
27  However, the affidavit submitted by Petitioner's trial counsel is
    vague and speculative and does not support a finding that juror #5's
28  inattentiveness had a substantial or injurious effect in determining
    the jury's verdict.

1  sufficient evidence to support Petitioner's conviction.  The record
2  is unclear as to how long juror #5 was asleep for on June 5, 2006,
3  and whether or not the other jurors' note referred to juror #5
4  sleeping on other occasions.  The record also does not reflect any
5  further concerns by the other jurors regarding juror #5's ability to
6  be fair and impartial.  In denying Petitioner's state habeas
7  petition, the state court reasonably concluded that, under these
8  circumstances, the trial court reasonably declined to make further
9  inquiry regarding juror #5.  Similarly, the Court finds that the
10  juror's alleged inattentiveness did not have a substantial and
11  injurious effect or influence in determining the jury's verdict.
12  Accordingly, Petitioner is not entitled to habeas relief on that
13  claim.

14                D. Ineffective Assistance of Appellate Counsel

15        Petitioner claims that appellate counsel was ineffective
16  because appellate counsel did not raise on appeal the claim that
17  juror #5 was inattentive.  The Due Process Clause of the Fourteenth
18  Amendment guarantees a criminal defendant the effective assistance
19  of counsel on his first appeal as of right.  <u>Evitts v. Lucey</u>, 469
20  U.S. 387, 391-405 (1985).[10]  Claims of ineffective assistance of
21  appellate counsel are reviewed according to the standard set out in
22  <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  <u>Smith v. Robbins</u>,
23  528 U.S. 259, 285 (2000).  First, the petitioner must show that

24
25

26        [10]Although the right to the effective assistance of counsel at
    trial is guaranteed to state criminal defendants by the Sixth
27  Amendment as applied to the states through the Fourteenth, the Sixth
    Amendment does not address a defendant's rights on appeal; the right
28  to effective state appellate counsel is derived purely from the
    Fourteenth Amendment's due process guarantee.  <u>See</u> <u>Evitts</u>, 469 U.S.
    at 392.

1  counsel's performance was objectively unreasonable, which in the

2  appellate context requires the petitioner to demonstrate that

3  counsel acted unreasonably in failing to discover and brief a merit-

4  worthy issue.  Smith, 528 U.S. at 285; Moormann v. Ryan, 628 F.3d

5  1102, 1106 (9th Cir. 2010).  Second, the petitioner must show

6  prejudice, which in this context means that the petitioner must

7  demonstrate a reasonable probability that, but for appellate

8  counsel's failure to raise the issue, the petitioner would have

9  prevailed in his appeal.  Smith, 528 U.S. at 285-86; Moormann, 628

10  F.3d at 1106.

11         Here, Petitioner has not shown that counsel's performance

12  was objectively unreasonable because his inattentive juror claim is

13  not meritorious.  Because this Court and the state court have now

14  rejected that claim, Petitioner cannot demonstrate that his

15  appellate counsel's failure to raise this claim on appeal was

16  objectively unreasonable.  An appellate lawyer's failure to raise a

17  meritless claim is neither unreasonable nor prejudicial.  Miller v.

18  Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) (noting that one of the

19  "hallmarks of effective appellate advocacy" is weeding out weaker

20  issues); see also Jones v. Barnes, 463 U.S. 745, 751 (1983) (holding

21  appellate counsel has no duty to raise every nonfrivolous claim

22  requested by appellant).  For the same reason, Petitioner was not

23  prejudiced by the manner in which his appeal was conducted.

24  Accordingly, Petitioner is not entitled to habeas relief on this

25  claim.

26                                  V.

27         For the foregoing reasons, the petition for a writ of

28  habeas corpus is hereby DENIED.  Further, a Certificate of

Appealability is DENIED.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions as moot, enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED     _08/30/2012_    _____
                                    **THELTON E. HENDERSON**
                                    **United States District Judge**

G:\PRO-SE\TEH\HC.07\Morales-07-6002.deny habeas.wpd